

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| LEVEL SLEEP LLC, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO.  2:18-CV-00119-RWS |
| v. | § | |
| | § | **SEALED** |
| SLEEP NUMBER CORPORATION, SELECT COMFORT RETAIL CORPORATION, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## ORDER

On November 12, 2019, the Court heard oral argument on a number of summary judgment

and *Daubert* motions.  Based on the parties' briefing and argument, the Court rules as follows:

- Sleep Number's Motion for Summary Judgment of Non-Infringement Regarding the Low Pressure Limitations (Docket No. 114) is **GRANTED**;
- Level Sleep's Motion for Summary Judgment of No Inequitable Conduct and No False Marking (Docket No. 110) is **GRANTED**;
- Sleep Number's Motion for Summary Judgment of Non-Infringement of Claim 17 of U.S. Patent No. 6,807,698 (Docket No. 147), Motion to Exclude Testimony of Elizabeth Friis and Bert Jacobson Regarding Their Spinal Alignment Opinions (Docket No. 112) and Motion to Exclude the Testimony of Christopher Bakewell Regarding his Income Approach Opinions (Docket No. 158) are **DENIED-AS-MOOT**.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine if the evidence

could lead a reasonable jury to find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  The applicable substantive law identifies which facts are material.  *Id.*

In determining whether a genuine issue for trial exists, a court views all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio*, 471 U.S. 574, 587 (1986). The moving party bears "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Once a party has made that showing, the nonmoving party bears the burden of establishing otherwise by supporting his contentions with some evidence. *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). The non-moving party cannot "rest upon mere allegations or denials of [the] pleading but must set forth specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted). "Summary judgment is appropriate if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to a party's case." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (quoting *Celotex*, 477 U.S. at 322).

## DISCUSSION

### I.    Sleep Number's Sealed Motion for Summary Judgment of Non-Infringement Regarding Low Pressure Limitations (Docket No. 114).

Plaintiff Level Sleep alleges that Defendant Sleep Number infringes U.S. Patent No. 7,036,172 (the '172 patent) and U.S. Patent No. 6,807,698 (the '698 patent). Both patents relate to mattresses designed to enhance sleep quality by reducing two major causes of poor sleep: the buildup of pressures on the body and poor alignment. '172 patent 1:49–52; '698 patent 1:7–9. The patents explain that pressures exceeding the "ischemic pressure threshold," roughly 30 mmHg,

restrict capillary blood flow, which creates discomfort and causes sleepers to shift their position on a mattress. '698 patent 1:47–67. To that end, the asserted claims of both patents contain low pressure limitations, which the parties agreed should be construed identically. '698 patent 36:21 (claiming a mattress designed to establish "low supporting surface pressure" on the body); '172 patent 39:37–38 (claiming a mattress where a reclining body is supported by "low body pressure").

The parties' dispute centers around competing interpretations of the Court's construction of the low pressure limitations. Specifically, the parties dispute whether the low pressure limitations preclude mattresses exerting pressures greater than 40 mmHg.

Sleep Number argues that the Court recognized an upper limit of 40 mmHg to the low pressure limitations, meaning mattresses exerting pressures greater than 40 mmHg cannot literally infringe the patents. Docket No. 114 at 14. Sleep Number contends that summary judgment of noninfringement is warranted because the evidence shows that the accused mattresses exert pressures exceeding 40 mmHg. *Id.*

According to Level Sleep, Sleep Number's position is based on a construction that is both contrary to and rejected by the Court's ultimate construction, and its motion should fail on that basis. Docket No. 137 at 11–12. Level Sleep asserts that the low pressure limitations, as construed, contain no upper limit and permit pressures above 40 mmHg. Docket No. 137 at 7. Level Sleep alternatively suggests that the upper limit, if any, is "80 mmHg at the shoulders and hips." Docket No. 163 at 4. Level Sleep also made a single statement at the end of the motions hearing suggesting that an upper limit of 40 mmHg would not require that every pressure point be below that pressure.[1] *See* Docket No. 174 at 49:2–50:2. According to Level Sleep, Sleep Number's argument raises at

---

[1] Level Sleep asserted in its briefing that the patents do not require every pressure point to be below 40 mmHg to support its argument that the limitations do not impose an upper limit of 40 mmHg. Level Sleep did not argue in briefing that construing the terms with an upper limit of 40 mmHg would nevertheless allow infringing mattresses to exert pressures exceeding that limit.

most a factual dispute as to whether beds exerting pressures above 40 mmHg satisfy the limitation. *Id.* at 20.

The issue of whether the "low pressure" limitations contained an upper limit was argued and addressed during the *Markman* proceedings.   In light of the parties' competing interpretations, it is necessary to explain the Court's constructions of the "low pressure" limitations, which resolves the parties' dispute.

### a.  *The low pressure limitations, as construed by the Court, preclude mattresses exerting pressures exceeding 40 mmHg.*

The Court construed the low pressure limitations as "pressure of a level which materially reduces causes of bed-induced shifting" and further instructed that any testimony relating to the Court's construction must be "constrained by the Court's reasoning."  Docket No. 89 at 14, 28. The Court's order addressed the parties' competing arguments as to whether the "low pressure" limitations contained an "upper-limit."

In its claim construction briefing, Sleep Number argued that the term "low pressure" is a term of degree.  Docket No. 60 at 13.  As such, Sleep Number asserted that the specification must provide some standard for measuring that degree to avoid indefiniteness concerns.  *Id.* at 13.  Sleep Number then argued that the only examples of "low pressure" in the specification were pressures below "about 30 mmHg."  *Id.* at 15.  Sleep Number thus proposed that the Court construe "low pressure" to have an upper limit of 30 mmHg, meaning that the high-pressure points on the body had to be below that threshold.  *See* Docket No. 60 at 18 (explaining that, under its proposed construction, a jury would look to see whether the accused products "are below about 30 mmHg, or **whether they have points rising above 30 mmHg**) (emphasis added); *see also* Docket No. 79 at 15:14–15 ("If you're above 40, you're not low pressure."); *id.* at 30:4–12 ("[Y]ou lay on a pressure mat, . . . and whichever point of the body registers the highest pressure, that's what you've

got to score it at."). During the *Markman* hearing, Sleep Number suggested that the Court could alternatively impose a limit of 40 mmHg because the patents made clear that pressures above 40 mmHg were too high.  Docket No. 79 at 33:7–8.

Level Sleep opposed the imposition of a numerical limitation, arguing the terms needed no construction or alternatively should be construed as "[l]ower surface pressure supporting the body as compared to conventional mattresses."  Docket No. 56 at 10.  Level Sleep suggested that a numerical limit, if any, should be "surface pressures at the shoulder and hip that are below 80 mmHg *and* at the waist that are below 40 mmHg."  Docket No. 67 at 6 (emphasis added).  Similar to Sleep Number, Level Sleep thus suggested that the upper limit, if any, would need to be evaluated at the high pressure points, *i.e.*, the shoulders, hips and waist.

As stated above, the Court construed low pressure as "pressure of a level which materially reduces causes of bed-induced shifting," but instructed that any testimony relating to the Court's construction must be "constrained by the Court's reasoning."  Docket No. 89 at 14, 28 ("The parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning."); *see Fenner Inv. Ltd v. Microsoft Corp.*, 632 F. Supp. 627, 633 (E.D. Tex. 2009) (explaining the court's construction by reference to the court's reasoning). The Court's claim construction order explained that pressures above 40 mmHg are "too high" to satisfy the claims.

Contrary to Level Sleep's assertion, the Court recognized that there was some "upper limit" to the low pressure terms.  Docket No. 89 at 14.  The Court declined to adopt Sleep Number's proposed upper limit of 30 mmHg, finding the patents distinguished between "low body pressure" and "pressure below the ischemic pressure threshold."  Docket No. 89 at 13.  However, the Court agreed with and adopted Defendant's argument that the patents disclosed pressure levels (40 and

80 mmHg) that the patents "considered too high."  *Id.* at 15 (citing '698 patent at 11:61-67, Figure 4; '172 patent at 15:32–39, Figure 10; Docket No. 60 at 15–16); *see also* Docket No. 60 at 15-16 (arguing that "an intersurface pressure of 40 mmHg is ***not*** 'low' within the meaning of the claims.").  But the Court found that the patents "fail to clarify whether pressures between 30 mmHg and 40 mmHg are 'low.' "  *Id.* at 14.  As such, the Court determined that the patents did not "sufficiently establish a specific bright-line level."  *Id.*  But, as the Court explained, such numerical precision is not required when using terms of degree, because all "that is required is some standard for measuring the term of degree."  *Id.* at 13 (citing *Exmark Mfg. Co. v. Briggs & Stratton Power Prod. Grp.,* LLC, 879 F.3d 1332, 1346 (Fed. Cir. 2018)).  The Court concluded that the patents' examples of pressure levels that were "too high," including pressures of 40 mmHg, provided a sufficient standard to satisfy *Exmark*.  *Id.*

In sum, the Court declined to adopt a specific numerical limit because of ambiguity over whether pressures between 30 and 40 mmHg are "low."  However, the Court explained that pressures above 40 mmHg are "too high" to satisfy the claims, and thus set "some standard" for persons of ordinary skill in the art to set the upper-limit.

Level Sleep's argument that the terms contain no upper limit is inconsistent with the Court's reasoning.  Level Sleep's argument that the upper limit, if any, is 80 mmHg is inconsistent with the Court's explanation that the patents characterized pressures of 40 mmHg as too high. Level Sleep's unexplained and unsupported suggestion that a 40 mmHg limit allows pressure points above that limit is similarly unavailing.[2]  The upper-limit discussed in the claim construction order referred to a limit on the highest pressure points, as confirmed by both parties' arguments

---

[2] In light of the nature of Sleep Number's arguments during claim construction and on the instant motion, Level Sleep had ample notice and opportunity to develop this argument.

during claim construction.  Under the Court's construction, then, mattresses exerting pressures of 40 mmHg or above cannot satisfy the low pressure limitations.

### b. *There is no genuine dispute of material fact that the mattresses exert pressures exceeding the "low pressure" limitations.*

Given this clarification, the Court now turns to whether there is a genuine dispute of material fact sufficient to preclude summary judgment.  As explained in detail below, the Court finds that there is no genuine dispute of material fact because there is no evidence that the accused mattresses satisfy the low pressure limitation.

Both parties' arguments depend on Level Sleep's expert reports, which include pressure testing data for the accused mattresses.  Level Sleep's infringement expert, Dr. Friis, utilized pressure sensing mats to record surface pressure at numerous points along a test subject's body. Docket No. 114-1.  Dr. Friis found that, as compared to conventional mattresses, the accused mattresses (1) lowered the average pressure and (2) reduced the number of pressure points above 30 mmHg as compared to conventional innerspring mattresses.  *See, e.g.*, Docket No. 114-1 at 51– 52.  On this basis, Dr. Friis concluded that the accused mattresses exert pressure of a level which materially reduces causes of bed-induced shifting and thus exert low pressure.  *Id.*  Level Sleep's other infringement expert, Dr. Jacobson, reviewed Dr. Friis's data.  Dr. Jacobson similarly concluded that the accused beds exert pressure of a level which materially reduces causes of bed-induced shifting because the mattresses reduced the number of pressure readings above 30 mmHg and reduced average pressure.  *See, e.g.*, Docket No. 114-2 at 17.  The pressure testing data revealed that the maximum pressure of each mattress was above 40 mmHg.  Docket No. 114-4.

Sleep Number identifies Dr. Friis's expert reports and testimony as evidence that the mattresses do not meet the low pressure limitations.  Specifically, Sleep Number argues that the testing data shows the accused mattresses exert pressures above 40 mmHg, which are too high to

satisfy the low pressure limitation. Docket No. 114 at 18. Sleep Number further argues that Level Sleep's expert reports are "fatally flawed" because they do not address the fact that the beds exert pressures above 40 mmHg and do not properly apply the Court's construction. *Id.* at 17–18. Because Sleep Number has identified evidence showing the accused mattresses do not satisfy the "low pressure" limit, Sleep Number has satisfied its burden of demonstrating the absence of a genuine dispute. The burden now shifts to Level Sleep to show that a genuine dispute remains.

Level Sleep did not argue in briefing or at the hearing that the accused mattresses meet the 40 mmHg limit and fails to otherwise raise sufficient evidence to create a genuine dispute. Level Sleep's expert reports do not create a genuine dispute because the conclusions are not constrained to the Court's holding that pressures of 40 mmHg are too high. Though the experts concluded that the mattresses exerted pressure of a "level which materially reduces causes of bed-induced shifting" because of reduced average pressure and reduced percentage of high pressure points, the experts did not address the fact that the beds exerted pressures above 40 mmHg. Because the experts' conclusions are not constrained to the Court's construction, they fail to raise a genuine dispute for trial. *See* Docket No. 89 at 28 (explaining that testimony must be "constrained by the Court's reasoning."); *see also ICU Medical, Inc. v. Alaris Medical Sys., Inc.*, No. SA CV 04-00689, 2007 WL 8081360, at *13 (C.D. Cal. Jan. 22, 2007) (holding a party "cannot argue that a genuine issue of material fact exists because its expert . . . provides an analysis that is based on an inconsistent understanding of the claim construction text **or reasoning**") (emphasis added).

Level Sleep also "disputes that 'Dr. Friis's tests showed that all of the accused beds exerted pressure greater than 40 mmHg on at least one body part.' " Docket No. 137 at 8. Level Sleep argues that Dr. Friis's tests were not intended to determine whether the mattresses necessarily

created pressures above 40 mmHg.  *Id.*  Level Sleep concludes that there is no evidence that the accused beds "necessarily create pressures above 40 mmHg."  *Id.*

However, to satisfy its burden on summary judgment, Level Sleep must "set forth specific facts showing a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (citation omitted).  Level Sleep's argument amounts to nothing more than a mere denial that the evidence shows that the accused mattresses exert pressures above 40 mmHg.  Level Sleep offers no affirmative evidence showing that the accused mattresses exert pressures that do not exceed 40 mmHg.[3]  *Geiserman*, 893 F.2d at 793 (holding that summary judgment requires the non-movant to put on "some evidence").

Consistent with the Court's construction of the low pressure limitations, mattresses exerting pressures of 40 mmHg do not exert "low pressure" and cannot literally infringe the claims.  Level Sleep has not adequately demonstrated the existence of a genuine dispute of material fact that would support a finding that the accused mattresses exert pressures satisfying this 40 mmHg limit.  Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**.

## II.     Level Sleep's Motion for Summary Judgment of No Inequitable Conduct and No False Marking

Level Sleep moved for summary judgment on Sleep Number's counterclaims of inequitable conduct and false marking.  Docket No. 110.  Each counterclaim is addressed in turn.

### a.  Inequitable Conduct

Sleep Number claims that the '698 patent is unenforceable due to inequitable conduct arising out of the nonpayment of a maintenance fee.  Specifically, Sleep Number alleges that inventor

---

[3] The Court acknowledges that pressure points above 40 mmHg may, in some cases, be explained to have other causes. For example, inventor Phil Torbet stated in his deposition that pressure points of 40 mmHg could be caused by wrinkles or rivets in the fabric.  *See* Docket No. 137-38 at 238:18–239:10.  However, Level Sleep's experts fail to address the 40 mmHg pressure readings at all, and there is no evidence to demonstrating that the mattresses in fact exert pressures below 40 mmHg.

Roger Sramek intentionally failed to pay a maintenance fee due in October 2008 and intentionally deceived the PTO when he later represented that the nonpayment was unintentional.  Docket No. 135 at 13.  Level Sleep moves for summary judgment of no inequitable conduct, arguing that there is no evidence that the nonpayment was intentional and that intent to deceive the PTO is not the single most reasonable inference from the facts in the record.

     *i.*     *Factual Background*

Two of the named inventors of the patents-in-suit—Roger Sramek and Phil Torbet—started a company called NightCare, LLC.  Docket No. 110-11 at 214:14–18.  NightCare held licenses for the '698 and '172 patents as well as several other patents and patent applications covering pillows from Sausalito Pillow Company.  Docket No. 110-10 at 165-23–166:11.

In 2008, NightCare negotiated an agreement with Zinus, Inc. to license NightCare's patent portfolio and to manufacture and market products based on the licensed patents.  Docket No. 110-9 at 31:21–32:13; Docket No. 135-2.  On October 12, 2008, in the midst of negotiations, Zinus counsel Darien Wallace emailed NightCare counsel David Lovejoy and noted that many of the patents in NightCare's portfolio were no longer enforceable due to failure to pay maintenance fees and application fees.  Docket No. 110-25; Docket No. 135-2.

On October 14, 2008, Sramek wrote Zinus a letter discussing the expired patents.  Docket No. 135-17.  Sramek stated that he met with Lovejoy and NightCare CFO Joe Losch to discuss the patent portfolio, including the issue of the patents in "various states of expiration, abandonment etc."  *Id.*  Sramek represented that NightCare took steps to remedy the situation and stated that the '698 and '172 patents were "in full force and effect."  *Id.*  One day later, Losch emailed Sramek and advised that he "create a simple list . . . of these IPs with the relevant future action dates and costs" to stay on top of the deadlines.  Docket No. 135-18.  However, the maintenance fee for the

'698 patent, due on October 27, 2008, was not paid, and the patent expired.  Docket No. 110-27.

On November 10, 2008, NightCare and Zinus entered into an agreement licensing patents and

patent applications, including the '698 patent, to Zinus.  Docket No. 110-20.

On April 9, 2009, Zinus learned that the '698 patent had expired.  Docket No. 135-7.

Zinus's attorney prepared and filed a petition to revive the '698 patent.  Docket No. 110-26.

Relying on statements by Sramek, Wallace certified that the "delay in payment of the maintenance

fee to the patent was unintentional." *Id.*  According to Wallace, when he asked Sramek if they had

a basis to state that it was an "unintentionally missed maintenance fee," Sramek said that he "hadn't

been aware that the maintenance fee for the '698 patent had not been paid." *Id.* at 52:3–7.  Wallace

did not ask Sramek why the fee had not been paid.  *Id.* at 52:14–21.  On May 1, 2009, the Patent

Office granted the petition and reinstated the patent.  Docket No. 110-27.

In his deposition, Sramek stated that, from time to time, maybe every six months,

NightCare's patent attorney, Lovejoy, would send a patent and filing summary which would show

"what patents were in what stage of filing" and "when fees were due," including "filing fees and

maintenance fees."  Docket No. 135-1 at 154:1–20.  Sramek testified that he was "sure" Lovejoy

would have advised them of the '698 patent's maintenance fee due date, but did not recall details,

including how close to the due date he was informed. *Id.* at 186:5–10; 188:14–20.  When asked if

Sramek knew at the time of the October 14, 2008 letter that the '698 patent's maintenance fee was

due two weeks later, Sramek stated again that he did not remember specifically learning of the

maintenance fee due date.  *Id.* at 192:12–24.  He also stated that, although he met with Joe Losch

and David Lovejoy on October 13, 2008, they did not necessarily discuss the status of the

maintenance fee for the '698 patent.  Docket No. 152-1 at 195:24–196:5.

Sramek further represented that the '698 patent's maintenance fee "slipped through the cracks." Docket No. 135-1 at 190:23.  Sramek testified that NightCare had, on certain occasions, consciously decided not to pay application fees because of lack of funds or because the technology became a lower priority.  *Id*. at 192:12–24.  However, Sramek stated that the company "never once" made a conscious decision not to pay a maintenance fee on an issued patent.  *Id.* at 194:23–25.

ii.     *Applicable Law*

To maintain a patent, its owner must pay maintenance fees to the PTO at various points throughout the patent's life.  *See* 35 U.S.C. § 41(b).  Failure to pay the maintenance fee results in expiration of the patent.  *Id.* § 41(b)(2).  However, the PTO may accept a late maintenance fee payment if "the delay in payment is shown to the satisfaction of the Director to have been unintentional."  *Id.*  Thus, a petition to revive a patent after failure to pay a maintenance fee must include a statement that the delay in payment of the maintenance fee was unintentional.  37 C.F.R. § 1.378(b).  If the PTO grants the petition for late payment, "the patent shall be considered as not having expired at the end of the grace period."  35 U.S.C. § 41(c)(1).

The affirmative defense of inequitable conduct applies to conduct that takes place during the payment of maintenance fees.  *See Ulead Sys., Inc. v. Lex. Comput. & Mgmt. Corp.*, 351 F.3d 1139, 1144 (Fed. Cir. 2003); *In re Rembrandt Tech. LP Patent Litigation*, 899 F.3d 1254 (Fed. Cir. 2018).  "Inequitable conduct is an affirmative defense to patent infringement that, if proven, bars enforcement of a patent."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc); *Rembrandt* 899 F.3d at 1254.  "To prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent

to mislead or deceive the PTO." *Therasense*, 649 F.3d at 1285; *Ulead Sys.*, 351 F.3d at 1144 (Fed. Cir. 2003).  Whenever circumstantial evidence proffered to show either materiality or intent is susceptible to multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.  *Therasense*, 649 F.3d at 1290–91; *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008).  Indeed, the evidence must be sufficient to *require* a finding of inequitable conduct, and intent to deceive the PTO must be the "single most reasonable inference to be drawn from the evidence." *Therasense*, 649 F.3d at 1290; *ROY-G-BIV Corp. v. ABB, Ltd.*, 63 F. Supp. 690, 695 (E.D. Tex. 2014) (granting summary judgment where the evidence provided for "several reasonable inferences, all just as likely as the inference of intent to deceive").

Although summary judgment requires the Court to draw all reasonable inferences in favor of Sleep Number, the Court must view the evidence presented "through the prism of the substantive evidentiary burden," *Liberty Lobby*, 477 U.S. at 355.  Thus, the Court must evaluate whether the evidence is sufficient for a fact finder to find both a material misrepresentation and intent to deceive by clear and convincing evidence.  *Roy-G-BIV*, 633 F. Supp. 3d at 696.  Inquiries requiring judgment as to the credibility of a witness are reserved for the fact finder and are not appropriate for resolution at summary judgment.  *Monsanto Co. v. Bayer Bioscience N.V.*, 363 F.3d 1235, 1239–41 (Fed. Cir. 2004); *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004).

### iii.    *Analysis*

The first issue to address is whether there is sufficient evidence that the statement in question—that the failure to pay the '698 patent maintenance fee was unintentional—is in fact false.  If there was no false statement, there is no need to consider the materiality or intent prongs

of inequitable conduct.  *Scanner Tech.*, 528 F.3d at 1375.  The parties dispute whether Sramek knew a fee was due in October 2008 and therefore intentionally failed to pay the fee, or whether he inadvertently missed the deadline.

Sleep Number alleges that the evidence shows that Sramek "knew a fee was due on the '698 patent" and "purposefully did not pay the fee."  Docket No. 135 at 13.  Sleep Number argues that the most reasonable inference from the October 14, 2008 letter is that Sramek would have checked the status of the '698 patent before representing to Zinus that it was in full force and effect.  *Id.* at 14.  Sleep Number further alleges that the intense focus on the abandonment of patents in October 2008 precludes a jury from inferring that Sramek simply forgot about the maintenance fee payment two weeks later.  *Id.*  Sleep Number also argues that NightCare lacked the funds to pay the '698 patent fee.  According to Sleep Number, NightCare's financial status and its prior misrepresentation of its patent portfolio to Zinus leads to one reasonable conclusion: that NightCare continued to mislead Zinus by intentionally abandoning the '698 patent and then entering a licensing agreement with Zinus on the patent days later.[4]  *Id.* at 15–16.  Finally, Sleep Number argues that Sramek's testimony to the contrary requires a credibility determination by a factfinder, precluding summary judgment.  *Id.* at 17.

Level Sleep argues that there is no evidence demonstrating that NightCare intentionally missed the maintenance fee payment for the '698 patent.  Level Sleep relies on Sramek's deposition testimony in which he stated that NightCare made a mistake in not paying the fee on time and that the company would not have intentionally abandoned the '698 patent because it was extremely valuable.  Docket No. 110 at 8.

---

[4] Sleep Number also argues that NightCare had a history of intentionally not paying maintenance fees, as evidenced by Sramek's statements in his deposition.  However, Sleep Number mischaracterizes Sramek's testimony.  Sramek stated that NightCare would intentionally decide not to pay a patent "application fee," but it "never once" intentionally failed to pay the maintenance fee on an already-issued patent.  Docket No. 152-1 at 194:23–24.

Level Sleep argues that the most reasonable inference from the October 2008 events is that NightCare focused on the patents that had been abandoned instead of the patents that remained enforceable. *Id.* at 9. Level Sleep points out that Sramek's letter to Zinus makes no mention of future deadlines for either the '698 or '172 maintenance fees and argues that the most reasonable inference is that NightCare focused on the patents that had been abandoned. *Id.* Finally, Level Sleep argues that it would be unreasonable to infer that NightCare intentionally allowed a patent to expire while in the midst of licensing negotiations and days before signing a license agreement for the '698 patent. *Id.* at 10.

Reviewing the evidence and considering the range of reasonable inferences, Sleep Number has not provided sufficient evidence from which a fact finder could find, by clear and convincing evidence, that the nonpayment was intentional. The evidence from October 2008 provides for at least two reasonable inferences. A reasonable fact finder could infer that Sramek fully investigated the status of the '698 patent, including researching fee deadlines, and thus became aware of the '698 patent's maintenance fee shortly before it was due. While that inference is certainly reasonable, it is at least equally reasonable to infer that Sramek went no further than confirming that the '698 patent was in effect at the time of his investigation. Notably, neither the letter nor Darien Wallace's email stating that the '698 patent was enforceable refer to the '698 patent's maintenance fee. Moreover, Losch's email on October 15, 2008 recommends Sramek stay on top of action items for the patents but makes no reference to the upcoming '698 maintenance fee. There is no evidence that Sramek made the recommended list of action items, and in fact no email prior to April 2009 discusses the '698 patent's maintenance fee.

In sum, while it is reasonable to infer that Sramek learned of the '698 patent maintenance fee in October 2008, neither Sramek's statement nor the focus on expiring patents during that time

require such an inference.  Though Sramek's testimony that the nonpayment was unintentional would be subject to credibility determinations at trial, Sramek's testimony is not necessary to the Court's finding and therefore does not preclude summary judgment.  Because Sleep Number's evidence leads to "multiple reasonable inferences," all just as likely as the inference that Sramek intentionally failed to pay the maintenance fee, Sleep Number's evidence is insufficient for a fact-finder to determine "by clear and convincing evidence" that Sramek made a false statement to the PTO.  *Roy-G-Biv Corp. v. ABB, Ltd.*, 63 F. Supp. 3d at 695 (granting summary judgment of no inequitable conduct where there were "multiple reasonable inferences, all just as likely as the inference that [plaintiff] intentionally deceived the PTO"); *see also Scanner Tech.*, 528 F. 3d at 1379 (finding evidence supporting multiple "reasonable inferences" insufficient to demonstrate by clear and convincing evidence that Plaintiff made a false statement to the PTO).  As such, there is insufficient evidence to create a genuine dispute as to whether NightCare made a material misrepresentation to the PTO. Accordingly, Level Sleep's motion for summary judgment of no inequitable conduct is **GRANTED.**

### b.  *False Marking*

Level Sleep moves for summary judgment on Sleep Number's false marking counterclaim. Because Sleep Number has failed to submit evidence sufficient to demonstrate that Level Sleep intended to deceive the public as required by 35 U.S.C. § 292(a), Level Sleep's motion for summary judgment is **GRANTED.**

### i.  *Applicable Law*

The false marking statute prohibits, among other things, "mark[ing] upon, affix[ing] to, or us[ing] in advertising in connection with any unpatented article, the word 'patent' or any word or word or number importing that the same is patented, for the purpose of deceiving the public."  35

U.S.C. § 292(a).  An article is "unpatented" under the statute if it is not covered by at least one claim of each patent with which the article is marked.  *Clontech Labs, Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005).  A party alleging false marking must establish both that the marked article was unpatented and that the alleged false marking or mismarking was "for the purpose of deceiving the public."  *See Arcadia Mach. & Tool, Inc. v. Sturm, Ruger & Co., Inc.*, 786 F.2d 1124, 1125 (Fed. Cir. 1986).

The question of whether a false marking defendant acted with the requisite state of mind is a question of fact, ordinarily determined by the fact finder after trial.  *Clontech*, 406 F.3d at 1353. However, "[t]he bar for proving deceptive intent . . . is particularly high."  *Pequignot v. Solo Cup. Co.*, 608 F.3d 1356, 1363 (Fed. Cir. 2010).  The combination of a false statement and knowledge that the statement was false creates a rebuttable presumption of intent to deceive the public.  *Id.* at 1362–63; *Clontech*, 406 F.3d at 1352 ("[T]he fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent.").  This presumption may be negated by evidence of a good faith belief that the products practiced the patents, particularly good faith reliance on advice of counsel. *Pequignot*, 608 F.3d at 1364.

The statute provides a private right of action only to "[a] person who has suffered a competitive injury as a result of the violation of this section." 35 U.S.C. § 292(b).  Economic injury alone is insufficient.  Instead, the injury must be a "competitive injury," that is, " 'wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair competition.' " *See Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1400 (Fed. Cir. 2015) (quoting Black's Law Dictionary (9th ed. 2009)).

*ii.      Analysis*

Sleep Number's counterclaim for false marking is based on the TriSupport Mattress, which Level Sleep marked as patented by the '698 and '172 patents from roughly 2015 to 2018.  Docket No. 135-11.  According to Sleep Number, the TriSupport mattress did not practice the '698 patent because it did not have a "resilient top member" over a "resilient supporting means."  Docket No. 135 at 9.  Similarly, Sleep Number states that the Tricare mattress did not practice the '172 patent because it did not have a "structural modification" as required by the claims of the patent.  *Id.* at 10.  Sleep Number further alleges that Level Sleep knew the mattresses did not have these components and did not practice the patents.  *Id.* at 9–10.

Level Sleep moves for summary judgment on two bases: lack of competitive injury and lack of deceptive intent.  Because the Court finds that Sleep Number has not alleged sufficient facts to demonstrate deceptive intent, the Court need not address whether Sleep Number has raised a triable issue of fact regarding competitive injury.

Level Sleep argues there is no evidence that Level Sleep knew that the patents were falsely marked or that it otherwise intended to deceive the public.  To support its claim and in opposition to summary judgment, Sleep Number relies on statements made by Level Sleep's corporate representative, James Abodeely, during his May 8, 2019 deposition.  Docket No. 135 at 18.  However, Abodeely's statements reflect only Level Sleep's understanding of the TriSupport mattress's relation to the patents at the time of the deposition.  The statements are not evidence of Level Sleep's knowledge at the time the mattresses were marked.

Abodeely stated that Roger Sramek made the original decision to mark the TriSupport mattress with the '698 and '172 patents.  Docket No. 135-10 at 197:10–14.  Level Sleep later

changed the label to include only the '172 patent "based on conversations with counsel." *Id.* at 197:3–9.

With regard to the '698 patent, Abodeely stated that, based on "[his] understanding of the patent claims and in discussions with counsel," he agreed that the TriSupport mattress did not practice the '698 patent. *Id.* at 52:15-20.  However, Abodeely would not say that Sramek's original advice to mark the TriSupport mattress with the '698 patent was incorrect. *Id.* at 198:2–5 (stating he was not "comfortable" saying Mr. Sramek was wrong to mark the TriSupport mattress with the '698 patent).

Abodeely's testimony clarifies that his understanding at the time of the deposition that the TriSupport mattress did not practice the '698 patent is not evidence that he had that same knowledge when the mattress was actually marked.  Because Sleep Number has not demonstrated that Level Sleep knew the TriSupport mattress was falsely marked, the statements do not support a presumption of intent to deceive the public.

Abodeely's statements regarding the '172 patent are similarly unavailing.  Abodeely was never asked if he knew whether the mattress practiced the '172 patent.  In fact, it appears that, at the time of deposition, Abodeely actually understood the TriSupport mattress to practice the '172 patent:

> Q: . . . So here it says "Level Sleep discloses that the following Level Sleep products incorporate or reflect asserted claims," and then it lists asserted claims of the 172 patent and it's the TriSupport and the TriSupport Luxe.  Is that your understanding?
>
> A: To be certain I'd have to – I'd want to kind of review those claims specifically, but – and I would say I probably relied on – some interpretation of the patent claim – how the patent claims are interpreted from counsel, but yeah.  But generally speaking, yes.

*Id.* at 51:15–52:6.

Sleep Number supports its allegation of deceptive intent with Abodeely's statement that the TriSupport mattress did not have a "structural modification." Docket No. 135 at 10.  However, Abodeely again qualified his answer as based on his own understanding of the term.  Moreover, Abodeely stated that the decision to mark the TriSupport mattress with the '172 patent was, for a period of time, supported by counsel.  *Id.* at 197:3–9.  Abodeely's statement regarding his understanding of a claim term months after the alleged beds were marked does not evidence that Level Sleep knew the beds did not practice the '172 patent when they were marked.  This is particularly so where Abodeely made clear in his deposition that Level Sleep relied on advice from Sramek and, at least for a certain period of time, Level Sleep's counsel in marking the mattress with the '172 patent.  Good faith reliance on advice of counsel to mark a product supports a finding that that company did not knowingly falsely mark a product.  *See Pequignot*, 608 F.3d at 1364.

In sum, Sleep Number has not provided evidence that Level Sleep knew, at the time it marked the TriSupport Mattress with the '698 and '172 patent, that the mattress was falsely marked.  Accordingly, Sleep Number has not identified evidence that the alleged false marking was made with the intent to deceive the public.  Sleep Number has not raised a genuine dispute of false marking and Level Sleep's motion for summary judgment is **GRANTED**.

### III.    The Remaining Motions

In light of the grant of summary judgment of noninfringement on both the '698 and '172 patents, Sleep Number's Motion for Summary Judgment of Noninfringement of Claim 17 of U.S. Patent No. 6,807,698 (Docket No. 116), Sleep Number's Motion to Exclude the Testimony of Christopher Bakewell Regarding his Income Approach Opinions (Docket No. 118), and Sleep Number's Motion to Exclude the Testimony of Elizabeth Friis and Bert Jacobson Regarding Their Spinal Alignment Options (Docket No. 112) are **DENIED-AS-MOOT.**

**So ORDERED and SIGNED this 14th day of January, 2020.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE